UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREGORY HARDY,

                    Plaintiff,                    Case No. 1:20-cv-1224

v.                                               Hon. Hala Y. Jarbou

LANSING POLICE DEPARTMENT,
*et al.*,

                    Defendants.
_____/

**REPORT AND RECOMMENDATION**

Plaintiff Gregory Hardy ("Hardy") filed his third amended complaint against defendants the City of Lansing, Officer Sagar Kandel, Officer Jameil Bakri, Officer Stephanie Kennedy, Officer Aaron Bush, and Officer Christie Chiles.  *See* Third Amend. Compl. (ECF No. 46).  This matter is now before the Court on defendants' motion for summary judgment (ECF No. 157).

**I.      Hardy's third amended complaint**

Hardy's third amended complaint alleged that defendant Officers violated his constitutional rights when they responded to a disturbance at 1217 N. Grand River Avenue, Lansing, Michigan involving Hardy and Dominique Hall ("Hall"). The Court summarized the allegations as follows:

> In his third amended complaint, Hardy has alleged claims against the City of Lansing, as well as five City police officers in their individual and official capacities: Sagar Kandel; Jameil Bakri; Stephanie Kennedy; Aaron Bush; and Chirstie Chiles.  *See* Third Amend. Compl. at PageID.293.  Hardy filed this action pursuant to 42 U.S.C. § 1983 and has alleged that defendants violated his rights while he was a detainee.  *Id.*

1

Hardy alleged as follows. On or about July 21, 2020, he contacted the Lansing Police Department ("LPD") after being attacked by a perpetrator who had a "'Red Three Foot Fireman's' pipe wrench." *Id*. at ¶ 6, PageID.294. After Hardy gave statements, defendant Officer Kandel stated he would interview other witnesses. *Id*. Officer Kandel ordered "the other defendants" to place Hardy in handcuffs, which Hardy alleged were 'extremely' tight". *Id*. Hardy became "highly agitated" and "began making legal threats to Defendant Kandel." *Id*. At this time, Kandel "only interviewed friends and acquaintances of the perpetrator standing in front of where the perpetrator lived who were all [white] and who gave conflicting statements." *Id*. at PageID.294-295.

Hardy alleged that "each of the other defendant ofc's Bush, Bakari, Kennedy, and Chiles action(s) would follow [lacking in training] to cover for another fellow officer and friend who knew according to the evidence on scene during the investigation in its entirety that Plaintiff Hardy acted in self-defense." *Id*. at ¶ 7, PageID.295. In this regard, "other witnesses on the west side of the street" shouted to the "other defendant Ofc's", presumably defendants Bush, Bakari, Kennedy, and Chiles, that "you guys got the wrong one," to which defendant Bakari responded, "no, we got the right one." *Id*. Then, Officer Kandel advised the other defendants by radio that, "Hardy was good to go." *Id*. Kandel then stated, "they got places for people like me [Hardy]", after receiving a transmission that Hardy was a registered sex offender. *Id*.

Based on previously filed exhibits, Hardy was charged with assault with a dangerous weapon (felonious assault) ("an assault upon Dominique Hall with a dangerous weapon, to-wit: a knife, but without intending to commit the crime of murder or to inflict great bodily harm less than the crime of murder; contrary to MCL 750.82."). *See* Felony Complaint (ECF No. 1-1,PageID.26).

Hardy began hyperventilating, became disoriented, had trouble breathing, and cried out that his handcuffs were too tight. Id. Hardy was taken out of the squad car. *Id*. An ambulance arrived and plaintiff was placed on his back, on top of his handcuffs. *Id*. at ¶ 8, PageID.298. Once in the ambulance, Hardy said that he had problems with his back, said he could not breathe, and requested his inhaler from his car. *Id*. at PageID.299. Defendants searched Hardy's car, "pretending" to look for his inhaler. *Id*.

With respect to the search, Hardy alleged: that Officer Bush "claims to have located the knife on the driver seat of plaintiff's car"; that according to Officer Bakri, Hardy advised him that the knife was inside the multi-colored backpack; that according to Officer Bush, Officer Chiles advised Hardy and Hardy consented to search his vehicle to look for the knife. *Id*. at ¶ 9, PageID.296. One of the Officers gave the knife to Officer Kandel to tag as evidence. *Id*. Officer Bakri later testified that that "Hardy advised me that the knife was inside of the multi-colored backpack I saw him holding when I first arrived on scene." *Id*. at ¶ 10, PageID.296. The

criminal charge against Hardy was later dismissed without prejudice. *Id.* at ¶ 11, PageID.297.

Based on these facts, plaintiff alleged three counts: Count One (false arrest); Count Two (false imprisonment); and Count Three (use of excessive force). Hardy further alleged three separate claims of excessive force (in his words):

> they deliberately employed excessive use of force with: (1) "handcuffs" and with a complete disregards for (2) Hardy's injured back then denied Hardy his (3) "inhaler" all against Hardy during the arrest while being detained [detainees], and they failed to intervene in the misconduct of one another and other unnamed John Doe and Jane Doe Officer's in connection with the arrest where he has suffered unnecessary pain, mental anguish, emotional and physical injuries resulting from Defendant Ofc's inaction(s), where clearly established right(s) were binding.

*Id.* at ¶ 12, PageID.297.

Order (ECF No. 48, PageID.305-307).

As to the City of Lansing,

Plaintiff Gregory Hardy alleges that: (1) agents of the municipality, while acting under color of state law, (2) violated the plaintiff's constitutional rights and (3) that a municipality policy or custom of inaction(s) was the "moving" force behind the violation(s).

Third Amend. Compl. at PageID.45-46.

Hardy alleged, among other things, that defendant Officers' statements are "false, misleading and conflicting," that they performed an illegal search of his car, that they knew the alleged victim Hall was the aggressor, that some witnesses shouted "you guys got the wrong one," and that the charges against Hardy were later dismissed without prejudice. *Id.* at PageID.294-297.

Hardy's claims for false arrest in Count One and false imprisonment in Count Two arise under the Fourth Amendment. *Id.* at PageID.308. Hardy raised three claims for excessive force in Count Three. The Court construed Hardy's first claim (tight handcuffs) and second claim (being handcuffed while placed on his back in the ambulance) as the use of excessive force in

violation of the Fourth Amendment.  *Id*. at PageID.309-310.  The Court construed Hardy's third claim in Count Three as one for deliberate indifference to a serious medical need in violation of the Fourteenth Amendment.  *Id*. at PageID.310-311.

For his relief, Hardy seeks, among other things, $750,000.00 in punitive, compensatory, and continuing damages and expungement of his criminal record.  Third Amend. Compl. at ¶ 13, PageID.297-298.

## II.    Legal standard for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted).

4

"In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). As discussed, plaintiff filed a verified complaint, which has the same force and effect as an affidavit for purposes of responding to a motion for summary judgment. *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993). However, the Court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.    Hardy's federal constitutional claims

Hardy seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

"Personal involvement is necessary to establish section 1983 liability." *Murphy v. Grenier*, 406 Fed. Appx. 972, 974 (6th Cir. 2011). "It is axiomatic that the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions." *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999).

### A.   Officer Stephanie Kennedy

As an initial matter, Hardy's only allegation against Officer Kennedy is that she was at the scene for his arrest on July 21, 2020.  *See* Third Amended Compl. at ¶¶ 6-7, PageID.294-295.  Hardy's claims fail.  Hardy has not alleged any personal involvement by Officer Kennedy in any particular unconstitutional conduct.   In fact, Hardy cannot allege personal involvement because Officer Kennedy was not present at the scene.   In her uncontested affidavit, Kennedy stated that at the time of Hardy's arrest, she was assigned to the position of Court Services Officer. Kennedy Aff. (ECF No. 157-9, PageID.1032).   Kennedy was not physically present at 1217 N. Grand River Avenue, Lansing, Michigan at any time on July 21, 2020, and not personally involved in Hardy's arrest.   *Id*.   Kennedy stated that her "involvement in the investigation, arrest, and prosecution of Gregory Hardy was limited to reviewing the reports of the responding officers to verify the information complained in the criminal complaint and submitting said complaint to the Ingham County Prosecuting Attorney for review."  *Id*. at PageID.1033.   Accordingly, defendant Kennedy should be granted summary judgment on all counts.

### B.   Fourth Amendment (Counts 1 and 2)

Hardy's false arrest and false imprisonment claims arise under the Fourth Amendment, which provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

In *Weser v. Goodson*, 965 F.3d 507 (6th Cir. 2020), the Sixth Circuit explained:

> This court has recognized that claims for false arrest and malicious prosecution are both constitutionally cognizable and both arise under the Fourth Amendment.  *Howse v. Hodous*, 953 F.3d 402, 409 (6th Cir. 2020). When a false-imprisonment claim arises out of an alleged false arrest—as it does in this case—

those claims are identical, so we will simply refer to those two claims together as a false-arrest claim.  *See Corvin v. Bice*, No. 1:05-CV-219, 2007 WL 776501, at *4 (E.D. Tenn. Mar. 9, 2007) (citing *Walker v. Schaeffer*, 854 F.2d 138, 142 (6th Cir. 1988)).

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005). Similarly, one of the elements of a federal malicious-prosecution claim—and the most relevant one here—is that a plaintiff must show "that the officers helped start a prosecution against him without probable cause." *Howse*, 953 F.3d at 408. The decisive Fourth Amendment question for Weser's claim against [Deputy Sheriff] Anderson, therefore, is whether Anderson had probable cause to believe that Weser had committed criminal trespass.

For probable cause to exist for an arrest, the "facts and circumstances within the officer's knowledge [must be] sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003) (citation and internal quotation marks omitted).

*Weser*, 965 F.3d at 513-514.  In short, "probable cause is present when the circumstances known to an officer support the belief that a criminal offense has occurred" and "[a] finding of probable cause necessarily defeats a wrongful-arrest claim."  *Jones v. City of Elyria, Ohio*, 947 F.3d 905, 914 (6th Cir. 2020).

Hardy bases his false arrest claim on defendants' failure to interview unidentified witnesses at the scene who could have supported his claim that Hall (the victim) was the aggressor. In this regard, Hardy gave the following testimony at his deposition:

Q      Why do you believe that the officers committed a false arrest when they arrested you on that day?

A      It was just a whole – a string of things on the scene, that they first refused to address other witnesses on the west side of the streets that were saying, after they cuffed me, saying, 'You guys got the wrong one,' because that's what the Court decided when we went back to court, when I went to court for my preliminary on the charge of the arrest.

Q      Okay. Anything else? Just the witnesses?

7

A    Well, it came to find out that the witnesses had collaborated their stories, all the witnesses he had, and then the officers refused to take other witnesses after they cuffed me. I was actually cuffed before any investigation had begun. After I gave my statement, they cuffed me, say I'm not under arrest, 'but we just holding you.'

Hardy Dep. (ECF No. 157-5, PageID.1010) (emphasis omitted).

The record reflects that Officer Kandel interviewed Hall, that Officer Bush interviewed the other witnesses, and that Officer Bakri interviewed Hardy.

Officer Kandel presented Hall's interview as follows:

VICTIM'S STATEMENT

Upon arrival, both parties were separated. Officer Bush and Bakri were making contact with the subject (Gregory Hardy) that had the knife. I then made contact with the subject that had the wrench. That subject was later identified as victim, Dominque Hall.

Hall advised he met Hardy a few days ago. Hardy offered Hall to do some work for money. Hall advised he worked for Hardy a few times.  Hall advised yesterday, Hardy "propositioned" him for sexual favors.  Hall advised Hardy asked him to "suck his dick" for $50. Hall responded to Hardy by saying no. Hall advised Hardy was upset because of that.

Hall stated that Hardy came to his residence today approximately 20 minutes prior to the call came in [sic] to dispatch.  Hardy asked Hall to get inside his vehicle.  Hall stated he refused to get in the vehicle.  Hardy then told Hall that he would put him on the "front street" if he did not get inside the vehicle.  I asked Hall to clarify what front street meant and he stated that it was a common terminology for blackmailing.  Hall stated Hardy was trying to blackmail him for something that he did not do.  Hall advised he then got inside Hardy's vehicle.  Hall stated he told Hardy to leave him alone.  Hardy then began driving while Hall was still inside.  Hall advised short time later, Hardy brought him back to 1217 N Grand River.

Hall stated he began to get out of the Hardy's vehicle.  As Hall was opening the door, he turned around to look at Hardy.  Hardy then punched Hall one time in his nose with his right hand.  Hall then exited Hardy's vehicle.  Hall advised once he got of the vehicle, Hardy got out as well.  Hall advised Hardy had a knife in his hand.  Hall stated Hardy was holding the knife at his waist level as he began walking towards Hall.  Hardy then swung the knife at Hall.  Hall advised he was in fear and believed that Hardy had indented [sic] to stab him.  Hall advised he ran inside his apartment and grabbed a wrench.  Hall then goes towards Hardy's vehicle, holding

8

the wrench.  Hall then asked Hardy to leave his property.  Hall advised as Hardy was leaving, he turned the steering wheel of the vehicle towards him and began driving the vehicle towards his location.  Hall advised Hardy was trying to run him over with the vehicle.  Hardy then went up to the parking lot Romario's, which is across the street from 1217 N Grand River.  Hall stated he followed Hardy because he knew the other neighbor's [sic] were calling 911 and he did not want Hardy to leave without talking to police.  Hall stated when he got to the parking lot of Romario, he still had the wrench with him.  Hall stated Hardy then got out of the vehicle, still holding the knife.  Hall stated Hardy again started charging towards him with the knife.  Hall stated he then swung the wrench at Hardy to scare him.  Hall ended up hitting the front windshield of Hardy's vehicle instead.  Hall stated he only swung the wrench to scare him and he never intended to assault him.  Hall advised he then ran back to his residence as the police was arriving on scene.

VICTIM INJURIES

Hall advised his nose was swollen from him getting punched. No other injuries. Hall refused medical.

Police Report (ECF No. 157-4, PageID.988). Kandel took photos of victim Hall.  *Id*. at PageID.989, 997-998; ECF No. 157-6, PageID.1017-1018 (additional copies of the photos).

Officer Bush located a knife in the driver's seat of Hardy's vehicle, identified as a folding knife, black handle with silver blade.  *Id*. at PageID.988.  Officer Kandel noted that Hall "described the knife to be of a black handle with silver blade."  *Id*.  Officer Bush took photos of Hardy's vehicle and the knife.  *Id*. at PageID.989, 992-996.

In addition to assembling evidence, Officer Bush took the statements of three witnesses, Darcy Wildman, Joshua Reedy, and Robin Nolan.

While on scene, I made contact with Darcy Wildman. Wildman stated he only witnessed a portion of the fight. Wildman stated there was a verbal argument between Hall and Hardy, and at one point Hardy was looking for knife in his vehicle. Wildman stated he never actually saw a knife present but did observe Hall attack Hardy with a wrench. Wildman stated Hall swung the wrench at Hardy once and at Hardy's vehicle one more time.

Report (ECF No. 157-4, PageID.1004).

I also made contact with Joshua Reedy while on scene and he advised he first saw Hall and Hardy leave in Hardy's vehicle.  Reedy stated they were gone for

less than ten minutes and arrived back at 1217 N Grand River verbally arguing. Reedy stated Hardy then pulled out a knife and began trying to attack Hall with that knife.  Reedy described the knife as being approximately two inches long with a silver blade.  Reedy stated Hardy swung the knife at Hall approximately four times while they were standing approximately five feet apart.  Reedy stated it appeared that Hardy was trying to stab Hall.  Reedy stated Hall then went to the back of the residence and grabbed a wrench.  Reedy described it as a pipe wrench being approximately three feet long and red in color.  Reedy stated Hardy drove to the intersection of E Grand River and N Grand River while Hall was grabbing the wrench.  Reedy stated Hall went over to where Hardy parked the vehicle at that intersection and his [sic] Hardy's vehicle approximately two times.  Reedy stated Hall never attempted to hit Hardy with the Wrench.  Reedy advised Hall came back to 1217 N Grand River and the fight was over.

*Id*.

I also made contact with Robin Nolan on scene and she advised she is the one who called 911. Nolan stated she observed Hardy and Hall exit Hardy's vehicle while verbally arguing.  Nolan stated Hardy then pulled out a knife from an unknown pocket and she heard it click as it unfolded.  Nolan was unable to see the knife well enough to describe it to me.  Nolan stated Hardy swung the knife approximately three times with the knife reaching approximately one foot away from Hall's body.  Nolan stated Hall went to the back of the residence and grabbed a large pipe wrench.  Nolan stated that while Hardy's vehicle was parked on the road in front of the residence, Hall hit the passenger side door one time with the wrench.  Nolan stated that when this occurred, Hardy and Hall began chasing each other around in the road again with their weapons.  Nolan stated both Hardy and Hall swung their weapons at each other approximately ten times each.  Nolan stated neither of them were ever hit in the process. Nolan stated Hardy then drove down to the intersection of E Grand River and N Grand River.  Nolan stated Hall went across the road towards Hardy and then hit the windshield of the vehicle one time with the wrench.  Nolan stated Hall then came back to 1217 N Grand River and the fight had ended at that point.

*Id*. at PageID.1004-1005.

While Officers Kandel and Bush interviewed the victim and witnesses near 1217 N

Grand River Avenue, Officer Bakri interviewed Hardy in a parking lot across the street.  Hardy

gave an entirely different account of the events:

I made contact with Hardy at the intersection of W Cesar Chavez and N Grand River Ave. Hardy was just Southeast of the dispatched address where the victim, Dominique Hall resides. As I approach the scene in my patrol vehicle, Hardy was standing in the drivers side doorway of his silver Chevrolet Impala

10

holding a multi colored backpack. Hardy then placed the backpack on the drivers seat of the vehicle before speaking with me.

Hardy stated he just met Hall one week prior to this incident. Hardy hired Hall to remove an air conditioning unit for him. Hardy explained he tries to help out the unfortunate by giving them ways to make money. Shortly after, Hall began asking Hardy for money to buy crack. Hardy stated he decided not to have Hall around him anymore because of the drug use.

Yesterday, while Hardy was walking to pick up his vehicle from the mechanic shop, Residents of 1217 N Grand River began speaking negatively towards Hardy. Hardy felt that Hall was the one telling them to say it. Hardy was upset and decided further that he was not going to speak to Hall anymore. Today Hall called Hardy to talk. Hardy explained to Hall that he didn't want to be around him anymore. Hardy then went to Hall's residence and picked Hall up. Hardy and hall drove to a party store in Downtown Lansing and then back towards Hall's residence.

While on the way back to Hall's residence, Hall became upset because Hardy did not want to see him anymore. Hall began hitting the passenger side interior portion of the door, telling Hardy to let him out. Hardy felt Hall was trying to control him. Hardy advise Hall that they were almost to his residence. Hardy pulled into a parking lot at the Southeast corner of W Cesar Chavez and N Grand River to let Hall out of the vehicle. This is where the vehicle, and Hardy, were upon my arrival. Hall then exited the vehicle along with Hardy. Hardy walked with Hall towards Hall's residence stopping just before the street. Hardy stated Hall was not "hearing him" and didn't want to talk. Hall then went to his residence while Hardy went back to his vehicle.

Hardy advised he was sitting in his vehicle on the driver's side when he heard a loud bang and felt glass go all over him. Hardy stated he looked up and saw Hall with a "firemen" style red pipe wrench. Hall then hit the passenger side of the vehicle with the wrench. Hall then began moving towards the drivers side where Hardy was located. Hardy then exited the vehicle and took his knife out of his pocket for "self defense".  Hardy advised he began swinging the knife towards Hall to get him away from him and his car. Hardy advised Hall then went back to his residence. Hardy then called 911 emergency services.

Hardy advised me that the knife was inside of the Multi colored backpack I saw him holding when I first arrived on scene.

*Id*. at PageID.1001-1002.

Officer Bakri described his decision to arrest Hardy:

After interviewing Hardy, I received information from Ofc Bush and Kandel that Hardy was good to go for Felonious assault. I placed Hardy in handcuffs, checked them for tightness and double locked them. I advised Hardy he was being detained until I could speak with the other officers on scene. I then placed Hardy in the back of my patrol vehicle. After speaking with Ofc Bush and Ofc Kandel, I learned there was witness testimony that contradicted Hardy's statement. I then advised Hardy he would be under arrest for felonious assault.

*Id*. at PageID.1002.

Officer Chiles arrived when Officer Bakri was with Hardy:

I arrived on scene where Ofc Bakri was making contact with the accused, Gregory Hardy. Hardy was detained for being involved in a felonious assault. Ofc Bakri and I placed Hardy in handcuffs, checked them for tightness, and double-locked them. Hardy was placed in the back of Ofc Bakri's patrol vehicle.

*Id*. at PageID.1006.  Chiles read Hardy his *Miranda* rights and questioned him:

MIRANDA RIGHTS

I read Hardy his Miranda Rights verbatim from a Lansing Police Department Miranda Rights card. Hardy agreed to answer my questions.

MIRANDIZED STATEMENT

Hardy stated the knife involved in this incident was located in his backpack inside his vehicle.  Hardy gave verbal consent to search his vehicle.

*Id*.   The reports of Officers Kandel, Bush, Bakri, and Chiles accurately reflect the incidents as reflected in the Officers' Body Worn Camera (BWC) footage.  *See* BWC (Exhs. D, F, G and I).[1]

Hardy contends that defendant officers falsely arrested him because they failed to interview other witnesses.  Hardy presents no evidence to support this contention.  Officers Kandel and Bush interviewed Hall and the individuals who identified themselves as witnesses to the altercation.  While the BWC footage indicates that other individuals were in the vicinity of 1217 N Grand River Avenue, none of them responded to the officers' request for witnesses to come forward.  *See* BWC (Exh. G).  Hardy did not identify any other witnesses.

---

[1] The BWC footage (Exhs. D, F, G, I, K, L and M) appears on a flash drive (ECF No. 159).

In addition, probable cause supports Officer Bakri's decision to detain and arrest Hardy as the perpetrator.  As discussed, Hall appeared to be the victim.  He had injuries consistent with his statement that Hardy hit him.  The witness statements indicated that Hardy chased Hall with a knife, that Hardy tried to chase Hall with his car, and that Hall was trying to chase Hardy away with a large wrench.  These circumstances were sufficient to establish probable cause that Hardy committed a criminal offense against Hall.  *See Jones*, 947 F.3d at 914; *Thacker*, 328 F.3d at 255.  The existence of probable cause defeats Hardy's false arrest and false imprisonment claims.  *See Weser*, 965 F.3d at 513-514; *Jones*, 947 F.3d at 914.  Accordingly, defendants Kandel, Bush, Bakri and Chiles should be granted summary judgment as to false arrest and false imprisonment alleged in Counts 1 and 2.

### C.    Excessive Force (tight handcuffs and placement on his back) (Count 3)

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989).  Whether an officer has used excessive force in effecting an arrest depends on whether the officer's conduct is "objectively reasonable" in light of the facts and circumstances surrounding the arrest, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396-397.

A plaintiff may state a cause of action for excessive force based upon tight handcuffs.  *See Lyons v. City of Xenia*, 417 F.3d 565, 575 (6th Cir. 2005).

> In order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints;

and (3) the plaintiff experienced some physical injury resulting from the handcuffing.

*Morrison v. Board of Trustees of Green Township*, 583 F.3d 394, 401 (6th Cir. 2009) (internal

quotation marks omitted).

> Here, Hardy alleged that defendants used excessive force due to (1) tight handcuffs, and (2) being handcuffed behind the back while traveling in an ambulance, which aggravated a previous back injury.  In his response to the motion for summary judgment,

> Hardy alleges that the handcuffs left deep dark imprint-bruising on 'both wrist', slightly swollen for about (4) days and such action(s) highly aggravated Hardy's serious preexisting injured back where Hardy was out of commission for about (3) months and that officers ignored Hardy's complaints that the handcuffs were too tight.

Hardy Response (ECF No. 160, PageID.1095).  In support of this argument, Hardy presented

undated black and white photocopies of photographs regarding the alleged handcuff marks. All

that can be seen on the photocopies is what appears to be two shallow indentations on a left wrist

and a spot on what may be another wrist.  *See* Photos (ECF No. 160-6, PageID.1118-1119).  Hardy

also presented an MRI from August 30, 2018 which listed some impressions.[2]  MRI (ECF No.

160-7, PageID.1122).  Hardy does not present any medical opinion to interpret the MRI.

> Hardy's detention and arrest were documented on BWC footage from Officer Bakri

and Officer Chiles. BWC (Exhs. D and I).  Neither Officer Bush nor Officer Kandel had a role in

the handcuffing.  The footage does not include any complaints by Hardy that the handcuffs were

---

[2] The MRI from 2018 listed the following impressions from the author of the report, Peter A. Janick, M.D.: "Central disc bulge and tear at the L5 disc S1 level without superimposed disc extrusion or spinal stenosis"; "Mild generous spurring the facet joints bilaterally at the L5-S1 level without foraminal narrowing"; and, "No evidence of occult fracture or epidural hematoma." MRI (ECF No. 160-7, PageID.1122).  One of defendants' experts, Robert P. Farhat, D.O. reviewed reports of the July 21, 2020 incident, as well as Hardy's medical records before and after the incident. Farhat Report (ECF No. 157-12, PageID.1053-1055).  His conclusions included the following: "There is no documentation to support the examinee's allegation of neck and back pain from the incident of July 21, 2020"; and, "There is a documentation of pre-existing lumbar problem from 2018. I do not believe this condition was exacerbated or aggravated by this incident on July 21, 2020." *Id*. at PageID.1056.

too tight while being detained or that the handcuffs injured his back when the EMTs loaded him into the ambulance.

Next, Hardy has not presented evidence of injury due to the handcuffs and the record does not reflect that Hardy was suffering from any such injury. Hardy cites the Lansing Police Department Manual (Operational Procedure 500.03—Use of handcuffs and restraint devices) (ECF No. 160-2, PageID.1106). The purpose of the policy states, "Handcuffing is permitted when arrests are made, when there is some danger involved while dealing with a person(s), and when protective custody of incapacitated persons or persons requiring Medica/psychological treatment is necessary." *Id*. In arrest situations of adults, the policy provides in pertinent part:

> To ensure the safety of the person(s) arrested and to prevent escape of arrested subjects, all prisoners will be handcuffed in accordance with the following conditions: . . . All adults placed under arrest by the Lansing Police Department (LPD) will be handcuffed by the arresting or transporting officer unless injury, medical condition, deformity, or other extenuating circumstances exist. . . Prisoners being transported from one police agency to another within the Tri-County area or for a short distance will be handcuffed with hands behind the back.

*Id*. Officers Bakri and Chiles followed this policy. While plaintiff appears to contend that he had a medical condition or injury which exempted him from being handcuffed in the ambulance, that was not evident from his interaction with the Officers.

Furthermore, when Hardy arrived at the hospital, he did not seek any treatment related to injuries from either tight handcuffs or handcuffs aggravating his back. Rather, upon his arrival, Hardy verbally abused hospital staff, yelled obscenities at the staff calling them "motherfuckers", repeatedly yelled at hospital staff "get away from me," and resisted staff's attempts to treat him. *See* BWC (Exhs. K and L). Sparrow Hospital records reflect that Hardy

was combative and uncooperative as personnel tried to treat him, had a psychiatric disorder, and was screaming "get away from me."  *See* Hospital Record (ECF No. 157-10, PageID.1041-1046).

Hardy has failed to establish an excessive force claim related to tight handcuffs or a back injury due to being handcuffed during the ambulance trip to the hospital.  Accordingly, defendants Kandel, Bush, Bakri and Chiles should be granted summary judgment as to the excessive force claims alleged in Count 3.

### D.    Deliberate Indifference to a serious medical need (inhaler) (Count 3)

As discussed, Hardy's Count 3 involves a claim for deliberate indifference to a serious medical need in violation of the Fourteenth Amendment, *i.e.*, that defendants deprived him of his asthma inhaler while he was hyperventilating.  It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the 8th Amendment.  *Estelle v. Gamble*, 429 U.S. 97 (l976). "Pretrial detainees are analogously protected under the Due Process Clause of the Fourteenth Amendment."  *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004).  Thus, "[w]hether a convicted prisoner or a pretrial detainee, deliberate indifference to one's need for medical attention suffices for a claim under 42 U.S.C. § 1983."  *Id*.  *See Miller v. Calhoun County*, 408 F.3d 803, 812 (6th Cir. 2005) ("[a]lthough the Eighth Amendment's protections apply specifically to post-conviction inmates, the Due Process Clause of the Fourteenth Amendment operates to guarantee those same protections to pretrial detainees as well") (internal citation omitted).

A viable Eighth Amendment claim consists of an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  A court considering such a claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional

violation and if the officials acted with a sufficiently culpable state of mind.  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).  The objective component requires the infliction of serious pain or failure to treat a serious medical condition.  *Id*. at 8-9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety.  *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.   "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  Stated another way, the plaintiff must prove that each defendant acted with a "sufficiently culpable state of mind, equivalent to criminal recklessness." *Santiago v. Ringle*, 734, F.3d 585, 591 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 834, 839-40) (internal quotation marks omitted).

Here, Hardy alleged that he was hyperventilating, that his condition was sufficiently serious to call for an ambulance, that he told defendants the location of his asthma inhaler, that defendants searched his car for the inhaler, but that one of the officers took the inhaler and did not give it to him.

Hardy directed the deliberate indifference claim at Officer Chiles and testified that she took too long to get the inhaler and violated his constitutional rights by handing the inhaler to the EMTs at the scene rather than to him:

Q     And what is your impression of how the Lansing Police Department acted with deliberate indifference?

A        Well, I mean, there was ample opportunity for Officer Chiles, for Officer Chiles to get that inhaler, which is Albuterol. She did something else. She disengaged from what she was doing when she called the ambulance and disengaged from going to search my car, yeah.

Q        So your indifference claim is based upon the fact that you believe Officer Chiles did not obtain your inhaler quick enough?

A        That she was not quick enough like she was supposed to.

Q        But she did, in fact, find your inhaler, as the video demonstrated?

A        It was -- the inhaler was found, but it wasn't given to me. I'm still choking. I mean, I could see that in there, too, as well.

Q        If the video reflects that the officer handed the inhaler to EMTs that arrived on scene, would you dispute that?

A        Yes, I would. I mean, wait a minute. Don't get me wrong. I think that I know where the inhaler went to.

Q        So you admit that the inhaler was, in fact, handed off to the Lansing Fire Department --

A        Yeah. That doesn't fit the -- that doesn't fit the criteria of her giving the inhaler to me.

Hardy Dep. at PageID.1015 (emphasis omitted).

          Next, Hardy's claim that Officer Chiles did not act fast enough to get his inhaler is blatantly contradicted by the BWC footage.  Officer Chiles called for an ambulance due to Hardy's complaints about trouble breathing.  *See* BWC (Exh. I, 10:20-10:30).[3] The BWC footage reflects that Officer Chiles asked Hardy what was wrong, that Hardy did not clearly provide an answer, that Chiles asked if Hardy had an inhaler (*id*. at 11:50), that eventually Hardy referred to an inhaler on his car's dashboard (*id*. at 12:05), that Chiles got the keys to unlock Hardy's car (*id*. at 12:25) but there was no inhaler on the dashboard, that Chiles eventually located the inhaler in a bag in a

---

[3] The parenthetical number refers to the time on the video exhibit.

pocket of Hardy's backpack (*id*. at 14:05), that she showed the inhaler to Officer Bakri while he was talking to Hardy (*id*. at 14:35), that the ambulance arrived on the scene at that time, and that Chiles gave the inhaler to an EMT assisting Hardy (*id*. at 15:16).

Finally, Hardy contends that Officer Chiles violated his constitutional rights because she gave the inhaler to an EMT rather than to him.   Hardy's claim is frivolous.  Chiles did not disregard Hardy's serious medical needs by handing his medication to the health care provider treating Hardy.   Accordingly, defendants Kandel, Bush, Bakri and Chiles should be granted summary judgment as to the deliberate indifference claim alleged in Count 3.

### E.     Qualified Immunity

Defendant Officers also seek summary judgment on the basis of qualified immunity to Hardy's § 1983 claims.  *See* Defendants' Brief (ECF No. 157, PageID.957-959).  Under this defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The existence of the qualified immunity inquiry involves two questions: whether the defendant violated a constitutional right and whether that right was clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).   "These questions may be answered in any order; if either one is answered in the negative, then qualified immunity protects the official from civil damages." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016). For the reasons discussed, *supra*, defendant Officers are entitled to qualified immunity because they did not violate any of Hardy's constitutional rights.

IV.    **City of Lansing**

A municipality's liability under § 1983 must be based on more than respondeat superior, or the right to control employees.  *See Monell v. Department of Social Services*, 436 U.S. 658, 691, 694-95 (1978); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999); *Hays v. Jefferson County, Kentucky,* 668 F. 2d 869, 874-75 (6th Cir. 1982). A plaintiff who sues a city for constitutional violations under 42 U.S.C. § 1983 must establish that a governmental policy or custom caused the alleged injury.  *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998), citing *Monell*, 436 U.S. at 690-691. "In other words, a municipality can be liable under § 1983 only where its policies are 'the moving force' behind the constitutional violation." *Sova*, 142 F.3d 898 at 904, citing *Monell*, 436 U.S. at 694.

Here, Hardy's claim against the City of Lansing fails.  Hardy's third amended complaint does not allege a policy or custom that would subject the City to liability under § 1983. In his response, while Hardy refers to the City's Operational Procedure 500.03, he does not claim that the policy is unconstitutional. *See* Hardy's Response (ECF No. 160, PageID.1094-1095).  As discussed, Hardy apparently contends that defendant Officers failed to follow the procedure when they handcuffed him.

Second, there is no basis to hold the City liable under *Monell*.  As the Sixth Circuit explained in *Andrews v. Wayne County, Michigan*, 957 F.3d 714 (6th Cir. 2020):

> This court has "continuously held that under § 1983, a county can only be held liable if there is a showing of an underlying constitutional violation by the county's officials." *Burkey v. Hunter*, 790 F. App'x 40, 41 (6th Cir. 2020) (listing cases). Axiomatically, "[t]here can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act."  *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986)).

*Andrews*, 957 F.3d at 725.  Similarly, the City of Lansing can have no *Monell* municipal liability

under § 1983 because none of the defendant City Officers violated Hardy's constitutional rights.

Accordingly, defendant City of Lansing should be granted summary judgment on all counts.

### V.    Unknown Parties

Finally, Hardy has not identified the unknown parties which he refers to as "John

Doe and Jane Doe."  *See* Third Amend. Compl. at PageID.292.  In *Haddad v. Fromson*, 154 F.

Supp. 2d 1085 (W.D. Mich. 2001), this Court addressed the use of unnamed or "Doe" defendants

and explained that such defendants should be dismissed if the plaintiff fails to identify the

defendants during discovery:

> With regard to the unnamed Defendants, discovery is now closed, and
> Plaintiff has failed to amend his Complaint to identify these Defendants by name.
> In general, the use of unnamed defendants is not favored in the federal courts. *See
> Colle v. Brazos County, Tex.*, 981 F.2d 237, 243 (5th Cir.1993). The mere naming
> of a person by use of a fictitious title does not make that person a party to a lawsuit,
> and it does not prevent the entry of final judgment.  *Nagle v. Lee*, 807 F.2d 435,
> 440 (5th Cir.1987). The appropriate treatment of Doe defendants is to delay taking
> action with regard to them until plaintiff has had an adequate time in discovery to
> identify them by name. Plaintiff has had that opportunity, but he has failed to
> properly identify the unnamed Defendants. Those Defendants will therefore be
> dismissed without prejudice.

*Haddad*, 154 F. Supp. 2d at 1093.  As in *Haddad*, discovery is closed, and Hardy has failed to

identify or serve the unknown parties.  Accordingly, the unknown parties should be dismissed.

### VI.    RECOMMENDATION

Accordingly, I respectfully recommend that defendants' motion for summary

judgment (ECF No. 157) be **GRANTED** as to all defendants, that the unknown parties be

**DISMISSED**, and that this case be terminated.

Dated:  September 8, 2023                              /s/ Ray Kent
                                                      RAY KENT
                                                      United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).